# In the United States Court of Federal Claims

Nos. 20-120C & 20-150C (consolidated)
(Filed: May 8, 2020)
(Re-filed: May 26, 2020)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

QUANTICO TACTICAL INC.,

                    *Plaintiff,*

v.

THE UNITED STATES,

                    *Defendant,*

and

ATLANTIC DIVING SUPPLY, INC.

                    *Intervenor-Defendant.*

Motion to Disqualify, Duty of Loyalty, Duty of Confidentiality, ABA Model Rule 1.9, ABA Model Rule 1.6

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNIFIRE, INC.,

                    *Plaintiff,*

v.

THE UNITED STATES,

                    *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

1 Pursuant to the Protective Order entered in this case, this opinion was held open for fourteen days during which the parties could propose to chambers any appropriate redactions. Plaintiff proposed certain redactions, in which the government and intervenor did not join. Nevertheless, for good cause shown, we adopt plaintiff's proposed redactions. Those redactions are indicated by closed brackets below.

*David R. Hazelton*, Washington, D.C., with whom was *Kyle R. Jefcoat*, *Melissa Sherry*, and *Dean W. Baxtresser*, for plaintiff.

*Doug Hoffman*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom was *Martin F. Hockey, Jr.*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General, for defendant.

*Paul F. Khoury*, Washington, D.C., with whom was *John R. Prairie*, *Kendra P. Norwood*, and *J. Ryan Frazee*, for intervenor-defendant.

## OPINION

BRUGGINK, *Judge.*

This is a pre-award bid protest in which the protestor challenges its exclusion from the competitive range in a solicitation by the Defense Logistics Agency.  Prior to briefing and resolution of the merits, intervenor moved to disqualify as counsel the firm representing the protestor because it had previously represented the intervenor.  The motion is fully briefed, and oral argument was held on April 29, 2020.  We granted the motion by short order on May 1, 2020.  This opinion more fully explains the result.

## BACKGROUND

On November 16, 2018, the Defense Logistics Agency ("DLA") issued Solicitation No. SPE8EJ-18-R-0001 ("RFP") for the Special Operations Equipment ("SOE") Tailored Logistics Support ("TLS") Program with an original proposal deadline of January 8, 2019, which was later extended to January 18, 2019.  Plaintiff Quantico Tactical, Inc. ("Quantico") submitted a proposal by January 17, 2019, and nine months later, on December 4, 2019, DLA informed Quantico that it was being excluded from the competitive range.

On December 23, 2019, Quantico submitted a bid protest to the Government Accountability Office ("GAO").  Unsatisfied with the agency's production of documents at GAO, Quantico withdrew its GAO protest and filed the present action on February 3, 2020.  On February 24, 2020, another offeror excluded from the competitive range, Unifire, Inc. ("Unifire"), filed a protest at the court, which was subsequently consolidated with this case as the lead.  On February 27, 2020, one of the offerors in the competitive range, Atlantic Diving Supply, Inc. ("ADS"), filed a motion to intervene, alleging

that Quantico's protest implicated its own interests in remaining in the competitive range. We granted intervention on March 3, 2020.

On March 12, 2020, Quantico moved to supplement the administrative record ("AR"), including seeking leave to take discovery from ADS. On March 20, 2020, ADS moved for disqualification of Latham & Watkins ("Latham") as counsel for Quantico because the firm had previously represented ADS in what it alleged was a related matter. On April 10, 2020, Quantico moved to amend its complaint to clarify the relief it seeks regarding ADS and DLA's actions toward it. That motion and the motion to supplement the record remain pending.

During oral argument on the pending motion, plaintiff's counsel made a request to again amend the complaint and to produce affidavits in reply to ADS' arguments made in its April 27, 2020 response to the motion for a status conference. The rationale offered was that Quantico could narrow its allegations to assuage the court's concerns expressed at oral argument regarding the overlap in issues between Latham's earlier representation of ADS and its work for Quantico now. We denied both requests in our May 1, 2020 order.

I. The Complaint and Subsequent Allegations

Quantico's complaint challenges its exclusion from the competitive range for the SOE TLS Program, claiming, among other things, that the agency was biased against it in favor of ADS and that the two companies had engaged over several years in competition to supply special operations services to DLA. The complaint also alleges that ADS committed fraud and other criminal misconduct in relation to its incumbent SOE TLS Program contract and fraudulently represented its small business status. The complaint and plaintiff's other papers make frequent mention of a Federal Civil False Claims Act, 31 U.S.C. § 3729 ("FCA") action brought on behalf of the United States against ADS, dated July 2, 2015.

In its motion to supplement the record, Quantico contends that the record is missing entire categories of documents, including: "(1) key materials referenced in the memorandum titled as the "Pre-Negotiation Briefing Memorandum/Competitive Range Determination" for the SOE TLS procurement (AR Tab 53 at 4320-496); (2) price analysis and evaluation materials; and (3) documents evincing the government's consideration of ADS fraud that are at the heart of several critical issues raised by Quantico." Pl.'s Memo. in Support of Mot. to Suppl. ("Pl.'s Mem. in Support") 3 (ECF No. 30-1). In that third category, Quantico seeks to supplement the AR with

documents that it alleges describe and relate to "procurement fraud by ADS and multiple co-conspirators" resulting in six FCA settlements. *Id.* at 4. Quantico then argues that DLA's refusal to take any meaningful action "in light of this major fraud" shows the agency's bias and taints its evaluation of Quantico. *Id.* Consideration of the motion to supplement has been suspended pending resolution of the motion to disqualify. We will examine some of the allegations more fully below, however, as they are relevant to the issue of disqualification of counsel.

## II. The Motion to Disqualify and Latham's Prior Representation of ADS

Shortly after Quantico filed its motion to supplement, ADS sought to disqualify Latham as counsel for plaintiff, arguing that, "[b]ecause Quantico's allegations against ADS are substantially related to Latham's prior work for ADS and leverage confidential information that Latham gained in its representation of ADS, Latham has breached the duties of loyalty and confidentiality."[2] Reply in Supp. of Mot. to Disqualify ("ADS Reply") 1. Intervenor cites Rules 1.9(a) and 1.6 of the ABA Model Rules of Professional Conduct as well as Rules 1.9 and 1.6 of the D.C. Rules of Professional Conduct for a restatement of the duties owed by attorneys at Latham to ADS as a former client. Attached in support of its motion, ADS submitted the Declaration of Luke Hillier, who served as Chief Executive Officer of ADS in 2010. *See* Declaration of Luke Hillier ("Hillier Decl.") (ECF No. 32-4).

In his declaration, Mr. Hillier explains that ADS has served as one of multiple incumbent contractors on the SOE TLS Program since 2009. He provides that, in May 2010, ADS retained Latham "as legal counsel to represent ADS in preparing for a potential initial public offering.[3]" Hillier Decl. ¶ 3. Mr. Hillier further states that "Latham's representation of ADS involved performing legal due diligence of ADS's business, which included . . . reviewing ADS's major contracts[.]" *Id.* ¶ 4. ADS avers that it "gave Latham full and open access to the company's records through an electronic

---

2 Specifically, ADS alleges that Quantico's motion to supplement and complete the AR includes additional allegations that "draw an even closer link to Latham's prior work for ADS[,]" and that the companies identified in the motion "are the very same companies Latham advised ADS to identify as related parties in ADS's Form S-1[,]" as discussed above. Mem. in Supp. of Mot. to Disqualify ("ADS Mem.") 17-18 (ECF No. 32-2).

3 This is evinced by an Engagement Letter sent to ADS by Latham, dated May 7, 2010. Ex. 1, Engagement Letter (ECF No. 32-3).

data room[,]" which included "highly confidential information concerning the company's organizational structure, finances, legal matters, and government contracts, including ADS's contracts with DOD." ADS Mem. in Support of its Mot. to Disqualify 8 (ECF No. 32-2). Further, Mr. Hillier declared that "a key component of Latham's due diligence was reviewing all aspects of ADS's government contracts business – especially ADS's largest government contract at the time, the SOE TLS Program. Hillier Decl. ¶ 6. "Latham had access to highly confidential and proprietary information concerning all aspects of ADS's performance of its SOE TLS Program, including information related to its bidding and pricing strategy for task orders competed among the other SOE TLS contract holders." *Id.* ¶ 7. The information provided to and reviewed by Latham, according to Mr. Hillier, included information not disclosed in the publicly filed SEC Form S-1. *Id.* ¶ 11.

Latham billed over [             ] for legal services to ADS. Multiple attorneys worked on the matter, including one of Quantico's counsel in the subject bid protest, [         ]. Ex. 3, Consolidated Invoices 4, 6, 9, 12, and 30 (ECF No. 32-5). The timekeeping entries made by Latham attorneys include entries for "review[ing] Department of Defense backup," "review[i]ng updated diligence documents in dataroom," "review[ing] pending business report uploaded to dataroom[.]" *Id.* at 22, 23.

The Form S-1 was filed by Latham on behalf of ADS with the SEC on February 8, 2011. It discloses, "among other things, the various legal risks associated with ADS's U.S. government contracting business on which Latham advised ADS during its representation," including, Small Business Act and U.S. Small Business Administration ("SBA") size status regulations; "the risk of not receiving a follow-on contract under the SOE TLS;" "the risk of ADS not being able to participate in small business set-aside contracts such as the SOE TLS;" the risks associated with "ADS's acquisition of MAR-VEL International, Inc.; and related party transactions with, among other companies, MJL Enterprises, LLC, Mythics, Inc. and Tactical Distributors, LLC." *Id.* ¶ 10; Ex. 4, ADS' Form S-1 9-18, 23, 45, 91, and 92 (ECF No. 32-6).

## DISCUSSION

Courts have the inherent power and duty to "supervise the conduct of the members of [their] bar[s]" to ensure that attorneys' moral and ethical responsibilities are not breached. *Richardson v. Hamilton Intern. Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972); *see also Kenosha Auto Transp. Corp. v. United States*, 206 Ct. Cl. 888, 891 (1975) (opining that "[t]he Canons of

Professional Responsibility are applicable to proceedings in this court, and we have the inherent power to assist in their enforcement."). While disqualification of counsel has been viewed as an extreme measure, "courts have broad discretion to order attorney disqualification[.]" *City of Fresno v. United States*, 143 Fed. Cl. 226, 231 (2019) (citing *Tannahill v. United States*, 25 Cl. Ct. 149, 164 (1992)).

In assessing a disqualification motion, this Court "is guided by the Model Rules of Professional Conduct of the American Bar Association, the Rules of Professional Conduct of the Bar to which the attorney at issue is admitted to practice, and relevant case law. *Bayside Fed. Sav. & Loan Ass'n v. United States*, 57 Fed. Cl. 18, 20–21 (2003) (citation omitted). We start by looking to the text of the model rules. *City of Fresno*, 143 Fed. Cl. at 233. The moving party bears the burden of showing that disqualification is warranted. *See generally Commonwealth Sci. & Indus. Research Org. v. Toshiba Am. Info. Sys., Inc.,* 297 F. App'x 970, 973-75 (Fed. Cir. 2008) (applying 5th Circuit law).

ADS urges that Latham must be disqualified from representing Quantico in this matter because the firm has breached its duties of loyalty and confidentiality to it as a former client. Although distinct, the two duties are often considered together because the possibility that a lawyer might disclose confidential information reads on the question of whether that attorney has breached its duty of loyalty. *See Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F.3d 1280, 1286 (Fed. Cir. 2016) (applying 5th Circuit law). But either alone may be disqualifying.

In opposition, Quantico argues that "ADS has failed to prove that Latham's limited representation in 2010-2011" regarding the preparation of the Form S-1 was a "substantially related" matter, that Latham never received any privileged or confidential information about ADS's government contracts, and that third-party representatives were present in every discussion that Latham had with ADS. Pl.'s Opp. to Mot. to Disqualify 7, 8 ("Pl.'s Opp'n"). Quantico also argues that Latham's disqualification would impose a substantial hardship on it. It supports its response with the affidavit of [          ], an attorney with Latham & Watkins. We begin with the duty of loyalty, as it is dispositive.

## I. Latham's Duty of Loyalty to ADS

ADS relies primarily on ABA Model Rule 1.9(a), which provides, in relevant part, that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a

substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  Model Rules of Prof'l Conduct 1.9 (a) (Am. Bar Ass'n 2018).[4]  Thus the rule applies to (1) a lawyer who previously had an attorney-client relationship with a former client; (2) to prohibit representation in the same or substantially related matter when; (3) the interests of the former and current client are materially adverse; unless (4) the former client "gives informed consent, confirmed in writing."  *Id.*

It is undisputed that Latham represented ADS between 2010 and 2011 and advised ADS in preparing and filing the Form S-1 with the SEC. Moreover, as Quantico's complaint includes allegations that directly challenge ADS' eligibility to bid under the SOE TLS Program, the interests of Latham's former client, ADS, and its current client, Quantico, are "materially adverse."  Nor is there any question whether Latham was given "informed consent, confirmed in writing" by ADS prior to its representation of Quantico in the subject bid-protest.[5]  Thus the only issue for decision is whether the matters are "substantially related."

While we recognize the general right of a party to choose its counsel, "a client's entitlement to an attorney's adherence to her duty of loyalty, encompassing a duty of confidentiality" can override that right.  *Dynamic 3D Geosolutions*, 837 F.3d at 1286 (citing ABA Model Rules r. 1.9 cmts. 4, 7). Comment 3 to Model Rule 1.9 explains that "[m]atters are 'substantially related' . . . if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  Model Rules of Prof'l Conduct 1.9. cmt. 3.  Thus "the obligation to protect a client's confidential information exists as part of the larger duty of loyalty owed to clients to maintain the integrity of the attorney-client relationship."  *Dynamic 3D Geosolutions*, 837 F.3d at 1286.  Although plainly germane to the

---

4 Rule 1.9(a) of the D.C. Rules of Professional Conduct provides a similar provision.

5 ADS represents that "Latham did not seek consent from ADS in filing litigation substantially related to its prior representation of ADS," in conflict with the terms of its Engagement Letter, in which Latham promised that "[w]ithout [ADS's] consent, [Latham] will not represent any other party in this matter, nor any other matter substantially related to it[,]"  Ex. 1, Engagement Letter (ECF No. 32-3); ADS Mem. 30 (ECF No. 32).

question of whether the duty of loyalty has been breached, we read the inquiry as posed by Comment 3 as disjunctive, which is to say that the similarity or overlap between legal and factual matters is sufficient by itself to disqualify counsel.  We find that under either approach, intervenor has established a breach of the duty of loyalty.

ADS cites the district court's approach in *Paul v. Judicial Watch, Inc.,* 571 F. Supp. 2d 17 (D.D.C. 2008), as an appropriate way to view the issues here.  There, the court relied on an identical comment to D.C. Rule of Professional Responsibility 1.9.  The district court observed that, under D.C. law, "when a party seeking disqualification carries its burden of persuading the factfinder that two matters, handled by the same counsel, are substantially related, there is an *irrebuttable presumption* that counsel received information during the first representation that is relevant to the second.'" *Id.* at 26 (quoting *Derrickson v. Derrickson,* 541 A.2d 149, 151-52 (D.C. 1988)).[6]  ADS also points to a D.C. Bar opinion that explains that "[t]wo matters are 'substantially related' to one another if there is a substantial risk that confidential factual information as would normally would have been obtained in the prior representation is useful or relevant in advancing the client's position in the new matter."  D.C. Ethics Op. 343 (2008).  It is thus the risk of disclosure alone that is relevant and dispositive under D.C. law.  Unnecessary is a showing of actual disclosure of confidential information.

ADS argues that a "substantial risk" has already been realized because the information that Latham acquired about ADS and the SOE TLS program during its representation in 2010 are "useful" and "relevant" to Quantico's position in the subject bid protest now.  ADS Mem. 29.  ADS urges that there can be "no doubt that Latham is using its inside knowledge of ADS to materially advance Quantico's position in this protest" as Latham represented ADS in preparing for an IPO, "which necessarily involved reviewing ADS's government contracts and performing related due diligence since the overwhelming majority of ADS's business is with the federal government." *Id.* at 26.  "[G]iven the nature of Quantico's attacks against

---

6 The court in *Derrickson* opined that if the party seeking disqualification shows that an "attorney-client relationship formerly existed" and that "the current litigation is substantially related to the prior representation[,]" then "the party seeking disqualification need not show that confidential information was actually transmitted[.]"  *Derrickson,* 541 A.2d at 152.  Moreover, "even if the attorney to be disqualified shows that he did not have access to or does not recall confidential information, this will not defeat the presumption which has been created." *Id.*

ADS" in the present suit, there is no doubt in intervenor's mind that Latham's 2010-2011 representation of ADS is "substantially related" to the subject bid protest. *Id.* at 24. Intervenor therefore argues that, under *Paul*, these matters are "substantially related," and "this Court should presume that Latham received confidential information in representing ADS that is relevant to this bid protest." *Id.* at 23. ADS also argues, in the alternative, that "the presumption is unnecessary in this case" as "Latham's invoices[,] time keeping entries,] and work product for ADS speak for themselves." *Id.* at 27.

### A. The Matters Are Substantially Related

We find that the legal and factual issues involved in Latham's representation of ADS and its representation of Quantico, although aimed at very different ends, are substantially related. As detailed below, there is significant overlap between the two. ADS prepared a chart comparing the subject matter addressed in Latham's prior work on behalf of ADS with some of Latham's current protest allegations against ADS. Excerpts are shown below:

| Latham's S-1 | Latham's Allegations |
| --- | --- |
| -Since 2006, we have been providing proposal advice and other assistance to MJL.<br><br>-MJL subcontracts certain products and services required under their contract to us.<br><br>-[O]ur staff assisted MJL with its accounting and bookkeeping for a nominal service fee.<br><br>-In 2007, MJL was owned 49% by Tactical Holdings and 51% by an unrelated party. In 2007, Tactical Holdings was owned by Daniel Clarkson, Luke Hillier, Michael Hillier, Jr. and R. Scott LaRose in the amounts of 16.64%, 50.08%, 16.64% and 16.64%, respectively.<br><br>-In June 2008, we acquired the | -ADS claimed to be a small business (fewer than 500 employees) even though it owned and/or controlled several other affiliated companies, including . . . MJL Enterprises[.]<br><br>-ADS managed essentially all MJL's daily business operations. . . .<br>ADS prepared and submitted to the Government all the SDVOSB set-aside proposals for MJL. (quoting complaint)<br><br>-[A]n ADS holding company held 49 percent ownership of MJL.<br><br>-ADS claimed to be a small business (fewer than 500 employees) even though it owned and/or controlled several other affiliated companies, including Mar-Vel International[.] |

| | |
|---|---|
| stock of MAR-VEL International, Inc., or "MAR-VEL."<br><br>-We acquired MAR-VEL in order to gain access to its Prime Vendor multiple- award IDIQ contract, which was the predecessor to our current Spec Ops TLS multiple-award IDIQ contract. The acquisition provided us with additional contract capacity to continue our sales growth until the award of our Spec Ops TLS contract was obtained. The aggregate purchase price for MAR-VEL was $5.5 million.<br><br>S-1 at 45, 85 (ECF No. 32-6) | Pl.'s Mem. in Support 8, 10 (ECF No. 30-1) |

Those excerpts compare information presented in the S-1 that Latham prepared for ADS with allegations in its briefing for supplementation of the record.  The issue of ADS' affiliated entities is present in both, and more critically, is very important, as will be elaborated below, to Quantico's case here.

Further, there is no question that the current complaint relies on assertions about Quantico's conduct going back to the time when Latham represented it.  ADS's comparison demonstrates that Latham's work on the S-1 included consideration of ADS' connection with at least two affiliated companies, MAR-VEL and MJL, a connection that resurfaces in Quantico's allegations in this protest regarding ADS' eligibility to bid, bid rigging, and fraud on the government.

[

].  The complaint recites that ADS settled several FCA claims against which involved "allegations that ADS and its owners and officers committed fraud, rigged bids, and bribed DLA officials in order to gain favorable treatment under the SOE TLS program." *Id.* ¶¶ 6, 23.  The next paragraph alleges that DLA has failed to properly consider this information as it is relevant to whether ADS is a responsible contractor eligible to do business with the government. *Id.* ¶ 7.  [

].

Paragraph 23 of the complaint alleges that DLA should have further disqualified ADS from bidding as a small business because of its prior allegedly false representations regarding its size status; paragraph 27 suggests that suspension or disbarment would have been appropriate proceedings for DLA to have undertaken against ADS.  Compl. ¶¶ 23, 27.  Although not explicitly mentioned in the Complaint, it is plain from Quantico's other papers, that the issue of ADS' small business size status is seen by Quantico as impacted by its affiliation with MAR-VEL and MJL, among other entities.

Attached to the complaint is the 2015 second amended False Claims Act complaint, which specifically alleges fraud in ADS' SBA size representations and explicitly references work done on the Form S-1.  Ex. 5, FCA Complaint 139, 278, and 279 (ECF No. 1-5).  Also attached is a settlement agreement resolving that suit which, although including no admission of guilt, recites the allegations made concerning Mar-Vel, MJL, and another affiliated entity, SEK Solutions, LLC. Ex. 6, FCA Settlement Agreement 2-4 (ECF No. 1-6).

Although the complaint only references these entities by implication, plaintiff's motion to supplement the record makes crystal clear just how central to Quantico's theory of the case ADS' history and corporate relationship with these other companies is.  The memorandum in support of Quantico's motion to supplement raises front and center whether ADS previously falsely certified its small business status to DLA.  It recites that the FCA action alleged that ADS was ineligible due to its corporate parentage or other common ownership of four related entities: Mar-Vel, MJL, SEK, and Karda Systems.  *See* Pl.'s Mem. in Support 7, 8 (ECF No. 30-1).  It goes on to state that ADS and these affiliates collude and rigged prices in order to gain award and favorable pricing terms from DLA.  *Id.* at 8-10.  These issues were left largely un-probed by DLA outside of a size determination that it sought from the Small Business Administration, which, according to Quantico, was based on incomplete information.  *Id.* at 13.  In Quantico's words:

> . . . ADS's owner (Luke Hillier [part-owner of Mythics]) and ADS's in- house counsel (Charles Salle) entered FCA settlements in August 2019. Notably, the settlement by ADS's owner is believed to involve the second largest FCA amount ever for an individual (which helps to highlight the

egregiousness of the misconduct).

. . . .

The ADS affiliates covered by this FCA settlement [described in the section titled "Overview of Procurement Fraud Impacting the SOE TLS Program] include: . . . Mar-Vel International, Inc.; Tactical Explores, Inc.; and Tactical Distributors, LLC.

. . . .

. . . ADS claimed to be a small business (fewer than 500 employees) even though it owned and/or controlled several other affiliated companies, including Mar-Vel International, MJL Enterprises, SEK Solutions, and Karda Systems. Ex. 48 (ADS FCA Compl.) at 27–46, 75–76. Notably, "ADS Tactical admitted that, if it had failed to qualify as a small business under SBA set-aside contracts, it could become 'ineligible to compete for orders under our Spec Ops TLS contract, which accounted for approximately 41 percent and 45 percent of our total net sales[.]

. . . .

Although ADS and Mar-Vel International initially competed against each other in the SOE TLS program, the two companies later decided to collude to rig bids and help each other win awards. Ex. 2 ¶¶ 331-34. The arrangement between these two companies "provided that ADS and Mar-Vel would agree to bid a certain way—e.g., bidding high, bidding low or not bidding at all—on requests for proposals" under the SOE TLS program. Id. ¶ 334. This arrangement "was designed to guarantee that at least one of the two companies would ultimately secure the bid." Id. Later, ADS acquired Mar-Vel for $5 million.

. . . .

In furtherance of this broad procurement fraud, ADS conspired with other offerors in the SOE TLS Program including MJL, SEK and Karda. Ex. 49 § C(i)-(iv). According to DOJ, ADS controlled these companies but hid that fact from DLA. Id. ADS's relationship with MJL—another bidder in the present RFP—is exemplary of ADS's control over its affiliated defendants. MJL, which claimed status as a Service-Disabled

Veteran Owned Small Business ("SDVOSB"), was founded by former ADS employee Martin Hierholzer, had the same address as an ADS facility, and an ADS holding company held 49 percent ownership of MJL.

Pl.'s Mem. in Support 6, 6 n.3, 8-10 (ECF No. 30-1).

It is plain that the relationship between ADS and the affiliated companies Mar-Vel, MLJ, and others, is a common issue in both of counsels' engagements. Latham, in preparing the S-1 Form, reviewed ADS' affiliations with those entities. It further advised ADS on the risks, as listed in the S-1, that ADS could lose it size status and thus its ability to bid on set-aside defense contracts. And its representation here in this bid protest, as we have seen above, plainly aims to pursue ADS' connection to these companies.

Quantico's only answer to this problem is that Latham's work on the S-1 for ADS did not, in fact, result in the disclosure of any confidential information, which would cut against a finding of risk to ADS from its appearance for Quantico now. Although we disagree with the premise, as discussed in detail below, we hold that, when the legal issues are so plainly overlapping and very material to the issues that the subsequent client has put before the court, a finding of actual disclosure of confidential information is unnecessary. As the court in *Paul* held, the risk of an unfair advantage for the new client against the old is simply too great for the representation to continue. 571 F. Supp. at 26 ("This conclusive presumption is more than adequate to demonstrate precisely the 'substantial possibility of an unfair advantage to the current client'") (quoting *Koller v. Richardson-Merrell Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984)).

We find that the matters involved in both representations by Latham are plainly substantially related without regard to whether actual disclosure of confidential information was made. The legal issues that Latham was hired to advise ADS on in 2010 included a general review of ADS' business with the federal government, most of which concerned the SOE TLS program, the subject of this bid protest. The representation also included a review of ADS' risks of losing those contracts if its status as a small business concern were compromised, necessarily calling for an evaluation of its relationship with affiliated entities. Those relationships are the subject of allegations in the complaint and are part of Quantico's motion to supplement the record. Plaintiff names those entities in its papers and cites to their affiliation with ADS as evidence of DLA's irrationality in concluding that ADS was a responsible bidder and otherwise qualified as a small business to bid on the

subject procurement.  Indeed, Quantico seeks discovery of ADS on these very issues.  The overlap is clear.[7]

  B.  There Is a Substantial Risk that ADS' Confidential Information
      Would Materially Advance Quantico's Position

ADS also avers that confidential information was disclosed to attorneys at Latham as part of their work preparing the S-1 and advising on a potential public offering.  Intervenor cites to the affidavit of its president, Mr. Hillier, as proof.  Because that confidential information is relevant to the issues in the present suit, disqualification is warranted, argues ADS.

Quantico responds that the corporate filing of an S-1 would not result in the review of information that would "materially advance" Quantico in the subject bid protest, Pl.'s Opp'n 21, and further that such representation "would not likely result in a law firm obtaining information that the company would reasonably expect to remain confidential[.]"[8] *Id.* at 23 (ECF No. 39). Quantico also argues that because the "S-1 and the amendments are public documents," and because all of the information that Latham attorney's reviewed "was accessed through an on-line data room to which underwriters, underwriters' counsel, and independent accountants had access [to,]" ADS has failed to specify any confidential information that was provided to Latham. *Id.* at 29-31.  The confidentiality *vel non* of the information reviewed by Latham is thus central to Quantico's defense of Latham's representation of it.

Relying on comment 3 to ABA Model Rule 1.9, which provides: "Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying[,]" Quantico argues that Latham should not be disqualified because every allegation in the complaint comes from either publicly available sources or Quantico's own documents and that ADS' discussions with counsel in 2010-11 regarding the S-1 Form were attended by multiple parties.  The import of the latter observation is that any privilege would be waived.  Plaintiff further cites to

---

7 Although counsel for Quantico has suggested in its papers and during oral argument that drafting an S-1 and the background review and preparation that goes into it is not as substantive as the court might believe, surely more than [          ] dollars in billings belies that inference.

8 Quantico also notes that "if Latham discovered any indicia of ADS's fraudulent misconduct," securities laws would have required their disclosure in the S-1 filing. *Id.*

Comment 8 of ABA Model Rule 1.9, which provides: "[T]he fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client."   Because the information regarding ADS cited in the complaint is in the public domain, no conflict with Latham's duty of loyalty arises, goes the argument.

ADS replies that the "public nature of some of these documents [i.e. SEC Form S-1, Latham's invoices to ADS, and the complaint] does not change the fact that Latham had access to highly confidential information, not all of which has been publicly disclosed[.]" ADS Reply 11 (ECF No. 41).  Because that confidential information is highly relevant to the issues that Quantico has put at bar, the matters are substantially related, argues intervenor.

Quantico relies heavily on *Soverain Software LLC v. CDW Corp.*, 2010 WL 1038731, at *4 (E.D. Tex. Mar. 18, 2010), where the district court in Texas denied a somewhat similar disqualification request in a patent infringement suit.  In *Soverain*, Newegg retained Latham as counsel to assist in preparing for a future IPO. *Id.* at *1.   Between September 2009 and December 2009, Mark Finkelstein, while working for Latham, assisted with the Newegg IPO and was tasked with "performing certain due diligence regarding Newegg's general IP matters and pending lawsuits in order to recommend to Latham's corporate attorney what disclosures were necessary during the IPO." *Id.*  Finkelstein participated in due diligence phone calls in which he "generally discussed the Soverain litigation and the risks and exposures related to the litigation[,]" billing approximately ten hours relating to the Newegg IPO matter. *Id.*  Finkelstein later left Latham and joined the firm, Jones Day, which had represented Soverain throughout the litigation, billing over 24,000 hours related to the litigation. *Id.*  Shortly afterwards, Newegg filed an emergency action to disqualify Jones Day from further representing Soverain based on Finkelstein's involvement. *Id.*

The court in *Soverain* determined that, "[f]or conflicts involving former representations, the movant must prove either [(1)] that the present and former matters are substantially related *or* [(2)] that the former attorney actually possesses relevant confidential information. *Id.* at *2. (citations omitted) (emphasis added).  The district court found neither.  In denying the motion to disqualify, the court held that "the record revealed no appearance of impropriety on the part of Finkelstein or Jones Day[,]" stating that "Jones Day ha[d] become extensively familiar with the case and expended millions of dollars in preparation, and removing Jones Day now would severely

prejudice Soverain.⁹" *Id.* at *4. Because of Mr. Finkelstein's limited involvement in the IPO, the court stated that "it is hard to believe" that the party requesting disqualification discussed "confidential information" such as "litigation and settlement strategy on due diligence phone calls where underwriters' counsel assisting in the IPO were present.'" *Id.*

*Soverain* is distinguishable on the facts. Finkelstein billed around ten hours to the Newegg IPO matter while working for Latham. The court there dealt only with a single attorney switching firms. Here, the entire firm billed hundreds of hours and switched clients. Finkelstein's involvement in the litigation between the two clients while at Latham was simply too little to draw a substantial link between the two representations. That is not the case here.

On the second prong, the *Soverain* court also noted that "the evidence show[ed] that Finkelstein did not have access to any confidential documents" relating to the patent litigation. *Id.* at *3. Here, the invoices confirm that Latham attorneys devoted hundreds of hours in preparing the S-1 Form for ADS, which included reviewing ADS' contracts and transactions while assessing the specific risks it recommended disclosing. As part of its due diligence, Latham reviewed risks associated with ADS' affiliated entities as they related to its compliance with SBA size status regulations, the same risks that are directly raised in the allegations of Quantico's complaint and its arguments in the motion to supplement.

Comment 3 to Model Rule 1.9 provides that, "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, *knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation.*" Model Rules of Prof'l Conduct r. 1.9, cmt. 3 (emphasis added). Here, it would have been impossible for Latham to have met its obligation to provide relevant and accurate legal advice regarding necessary disclosures to be made in the S-1 without an in-depth review of ADS' military contracts. Latham had to inform itself with more than "general knowledge" regarding ADS' business. We are entitled to infer that, in Latham's preparation of the S-1, confidential information was made available and that Latham had to exercise its judgment in what to disclose publicly. We accept at face value

---

9 In reaching this decision, the court noted that "[w]hile Newegg is not required to produce the actual confidential information, it has the burden to delineate with specificity what confidential information was shared[,]" a burden Newegg failed to meet. *Id.* at *4.

Mr. Hillier's representations in that regard.  The fact that other parties had access to some or all of that same confidential information does not change the fact that the information was not public.[10]  We note that no court has found it necessary that a legal privilege cover the information asserted to be at risk of disclosure by former counsel.

Moreover, we find this disqualification request more akin to that made in *H20 Plus, LLC v. Arch Personal Care Products, L.P.*, No. CIV.A. 10-3089, 2010 WL 4869096 (D.N.J. Nov. 23, 2010) (Magistrate's decision), aff'd, No. CIV. 10-3089, 2011 WL 1078584 (D.N.J. Mar. 21, 2011) (district court decision).  In *H20 Plus*, the magistrate judge disqualified the law firm of Kelley Drye & Warren ("KDW") as counsel for Defendants, Arch Personal Care Products, L.P and Arch Chemicals, Inc. (collectively, "Arch") in a breach of contract action, based on the finding that KDW's previous representation of H20 was substantially related to its current representation of Arch.  *Id.* at *1, *6.  As the parties agreed that KDW had a previous attorney-client relationship with H20 and that their interests were materially adverse, the court's analysis focused on whether the information that KDW had accessed in H20's electronic data room in the prior representation included confidential information that could be used against H20 in the current litigation.  *Id.* at *6.

The court relied on an opinion by the New Jersey Supreme Court regarding New Jersey's own Rule 1.9(a):

> (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client or (2) *facts relevant to the prior representation are both relevant and material to the subsequent representation*

*Id.* (quoting *City of Atl. City v. Trupos*, 201 N. J. 447, 452 (2010)) (emphasis added).  The district court judge, on appeal, also relied on the

---

10 ABA Formal Opinion 479 lends further support, stating that information is generally known "if it is widely recognized by members of the public in the relevant geographic area or it is widely recognized in the former client's industry, profession or trade."  ABA Formal Opinion 479 (Dec. 15, 2017). The opinion further explains that "the fact that the information may have been discussed in open court, or may be available in court records, in public libraries, or in other public repositories does not, standing alone, mean that the information is generally known[.]"  *Id.*

decision in *Trupos*. 2011 WL 1078584 at *4.

In applying New Jersey's equivalent to ABA Model Rule 1.9, the court concluded that H2O had established "beyond all doubt that KDW should be disqualified[]" as KDW previously represented H2O in the sale of its business and received and accessed confidential information during the course of the prior representation. 2010 WL 4869096 at *13. That broad knowledge of H2O's business, including confidential information, was more than enough to disqualify the firm from representing another party in a contract action against its former client.

We find the present predicament to be like that in *H2O Plus*. Latham's review of ADS' business generally, especially its government contracts, and its access to ADS' data room, is more than enough to support a finding that the firm had access to "both relevant and material" information to their subsequent representation of Quantico in the subject bid protest.

C. Latham Must Be Disqualified

In sum, we find that the issues brought to bear by the current protest implicate those that Latham was retained to advise ADS on earlier, which means that there is a "substantial risk" that the information learned by Latham in its preparation of the Form S-1 for ADS would materially advance Quantico's position in the subject bid protest. We also find that Latham had access to confidential information that is relevant to the present matter. Although Quantico urges that it will be prejudiced by having to switch horses mid-race, that harm is far outweighed by the potential of harm to ADS were the representation to continue. The same attorneys who once had unfettered access to ADS' proprietary information should not be sitting across the table at deposition inquiring into the same issues. Just as important is the public's interest in the fair and impartial administration of justice and the court's interest in preventing even the appearance of impropriety in the practice of law. The only conclusion is thus that Latham may not now represent an adverse party in matters that directly relate to its prior representation.

We note that the concerns embodied in Rule 1.9 are the same reason we cannot, as an alternative, accept the offer to limit Quantico's discovery request and to file a second amended complaint. The amended complaint and the motion to supplement constitute Quantico's current position in this litigation, and while reducing the claims asserted or restricting the scope of discovery requested might minimize the potential conflict, it might also affect Quantico's interests. The current representation is untenable.

## II.  ADS' Duty of Confidentiality to ADS

ADS also argues that "[t]he restrictions imposed by ABA Model Rule 1.9(a) and the corresponding D.C. Rule 1.9 are grounded in the obligations imposed by ABA Model Rule 1.6 and D.C. Rule 1.6 to protect client confidences and secrets."  ADS Mem. 24, 25 (citing Model Rules of Prof'l Conduct r. 1.6 (a)-(b) (Am. Bar Ass'n 2018) and D.C. R Prof. Conduct 1.6).[11] ABA Model Rule 1.6 provides in relevant part:

> (a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b).

> (b) A lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary[.]

Model Rules of Prof'l Conduct r. 1.6 (a)-(b) (Am. Bar Ass'n 2018). It argues that the court can ground disqualification independently under Rule 1.6.

---

11 D.C. Rule 1.6 similarly provides as follows:

> (a) Except when permitted under paragraph (c), (d), or (e), a lawyer shall not knowingly:
>
>> (1) reveal a confidence or secret of the lawyer's client;
>>
>> (2) use a confidence or secret of the lawyer's client to the disadvantage of the client;
>>
>> (3) use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person.
>
> (b) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client.

D.C. R Prof. Conduct 1.6.

We find that ABA Model Rule 1.6 is unnecessary to our ruling, although we note that, based on the Hillier Declaration, the allegations made in Quantico's complaint, and the subjects discussed in the S-1, we are satisfied that Latham was privy to confidential information related to the subject bid protest.

## CONCLUSION

For the above stated reasons, ADS' motion to disqualify Latham as counsel for Quantico is granted. Quantico shall have replacement counsel move to substitute counsel on or before June 12, 2020. All other deadlines remain stayed.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge